# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **KATHLEEN MAZZIO**, *on behalf of herself and all others similarly situated*, | |
| Plaintiff, | Case No.: |
| v. | |
| **AMERICAN AIRLINES GROUP INC., AMERICAN AIRLINES, INC., DELTA AIR LINES, INC., SOUTHWEST AIRLINES CO., UNITED CONTINENTAL HOLDINGS, INC.**, and **UNITED AIRLINES, INC.**, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Kathleen Mazzio ("Plaintiff"), individually and on behalf of all others similarly situated, brings this civil action for treble damages under the antitrust laws of the United States. This action arises out of a conspiracy by the four largest airlines in the United States—American Airlines, Inc., Delta Airlines, Southwest Airlines, and United Airlines (collectively, "Defendants")—to limit flight capacity and thereby fix, raise, maintain, and/or stabilize the price of domestic air travel services in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## INTRODUCTION

1.      In 2014, the United States airline industry enplaned 766 million passengers and flew nearly 900 billion miles. Eighty percent of domestic air travelers boarded planes operated by Defendants, the result of a wave of consolidation that swept through the airline industry over the last decade. Passengers paid $391 on average for domestic airfare, the highest price in eleven years. Flights are not only more expensive, but also more crowded: the average airplane flew at 81.6 percent capacity, a record level;

1

compared to just 69 percent in 2003 and 56 percent in 1991. Airfare and flight capacity move in tandem. Defendants wield their combined market power to unlawfully increase the price of airfare by reducing the number of available seats, manipulating supply and demand. Consolidation has raised fares, imposed new and higher fees, and reduced consumer choice and services.

2.     As alleged herein, Defendants entered into an illegal agreement, combination, or conspiracy to raise and maintain the price of domestic air travel services in the United States. As a result of Defendants' unlawful conduct, Plaintiff and members of the Class paid higher prices for domestic air travel services than they would have paid in a competitive market.

## I.     <u>JURISDICTION</u>

3.     Plaintiff files this complaint under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover tremble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

4.     This Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act,15 U.S.C. §§ 15 and 26

5.     Venue is proper in this District pursuant to Sections 12 of the Clayton Act, 15 U.S.C. §§ 22, and 28 U.S.C. § 1391 (b), (c), and (d) because one or more of the Defendants reside in this District, all of the Defendants transact business in this District, and a substantial portion of the affected interstate trade and commerce was carried out in this District.

6.     Defendants are subject to the personal jurisdiction of this Court by virtue of their contacts and activities, both nationwide and in the State of Illinois.

## II.    PARTIES

1.      Plaintiff Kathleen Mazzio is a citizen of the State of New Jersey and resides in Del Haven, New Jersey.  During the Class Period defined herein, Ms. Mazzio purchased tickets for domestic air travel directly from Defendants American and Southwest (as defined herein) for travel between multiple cities in the United States.  Ms. Mazzio suffered antitrust injury as a result of the violations alleged in this Complaint.

2.      Defendant American Airlines, Inc. ("American") is a Delaware corporation with its headquarters located at 4333 Amon Carter Boulevard, Fort Worth, Texas, 76155. American is a subsidiary of American Airlines Group Inc., also a Delaware corporation with its headquarters located in Forth Worth, Texas (collectively, "American"). American conducts air transportations services for consumers throughout the United Sates, including flights to and from this District.

3.      During the Class Period, American, either directly or through its subsidiaries and/or affiliates, sold domestic air travel services throughout the United States at artificially inflated levels as alleged herein.

4.      Defendant Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its headquarters located at 1030 Delta Boulevard, Atlanta, Georgia, 30354.  Delta conducts air transportations services for consumers throughout the United Sates, including flights to and from this District.

5.      During the Class Period, Delta, either directly or through its subsidiaries and/or affiliates, sold domestic air travel services throughout the United States at artificially inflated levels as alleged herein.

6.      Defendant Southwest Airlines Co. ("Southwest") is a Texas corporation with its headquarters located at 2702 Love Field Drive, Dallas, Texas, 75235.  Southwest conducts air transportations services for consumers throughout the United Sates, including flights to and from this District.

3

7.     During the Class Period, Southwest, either directly or through its subsidiaries and/or affiliates, sold domestic air travel services throughout the United States at artificially inflated levels as alleged herein.

8.     Defendant United Airlines, Inc.  is a Delaware corporation with its headquarters located at 233 S. Wacker Drive, Chicago, Illinois, 60606.  United is a wholly-owned subsidiary of United Continental Holdings, Inc., a Delaware corporation with its headquarters also located in Chicago, Illinois (collectively, "United"). United conducts air transportations services for consumers throughout the United Sates, including flights to and from this District.

9.     During the Class Period, United, either directly or through its subsidiaries and/or affiliates, sold domestic air travel services throughout the United States at artificially inflated levels as alleged herein.

### III.   UNNAMED CO-CONSPIRATORS

10.     On information and belief, at all relevant times, other airlines, entities, and/or persons, including, but not limited to, U.S. Airways (prior to its merger with American Airlines) willingly conspired with Defendants in their unlawful restraint of trade.  All allegations herein against Defendants are also alleged against these unnamed co-conspirators.

### IV.   AGENTS

11.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

### V.     FACTUAL ALLEGATIONS

**A.     The structure of the airline industry facilitates collusion among competitors.**

12.      The Airline Deregulation Act ("ADA"), passed in 1978, deregulated the domestic airline industry, removing government control over fares, routes, and market entry of new airlines.  The

purpose of the ADA was to allow market forces, rather than the government, to guide the domestic airline industry with the goal of creating a competitive marketplace for the purchase of airline services. After the passage of the ADA, Defendants competed over fares, routes, and seats.

13. More recently, however, a decade of unprecedented consolidation radically altered the United States airline industry's structure and market dynamics, allowing a handful of large companies to manipulate the price of domestic airfare. In 2005, the United States had nine major airlines, until AmericaWest merged into U.S. Airways. Then, in 2008, Delta and Northwest Airlines merged, continuing to operate as Delta. In 2010, United and Continental merged, with United as the surviving entity. That year, Southwest and AirTran also merged. Most recently, in 2013, American and U.S. Airways announced a potential $11 billion merger.

14. The United States Department of Justice ("DOJ") filed an antitrust complaint—captioned *United States v. U.S. Airways Group, Inc.*, No. 1:13-cv-01236 (D.D.C.)—challenging the proposed American-U.S. Airways merger, alleging that it would have substantially lessened competition for commercial air travel in local markets throughout the United States. The DOJ complaint outlined the Department's concerns about the increasingly concentrated airline industry and the potential for anticompetitive conduct in the marketplace for domestic air travel services, explaining that the structure of the industry was already conducive to coordinated behavior, because "[f]ew large players dominate the industry, each transaction is small; and most pricing is readily transparent." DOJ Compl. at ¶ 41. The merger "would make it easier for the remaining airlines to cooperate, rather than compete, on price and service." Id. ¶ 3.

15. The DOJ cited to an internal U.S. Airways presentation that concluded that industry consolidation has resulted in "Fewer and Larger Competitors." The structural change to "fewer and

larger competitors" has allowed "[t]he industry" to "reap the benefits." The benefits to the industry, as identified in the same presentation, include "capacity reductions."

16. Despite these concerns, the DOJ eventually settled the case, allowing the merger to occur, conditioned on the divesture of certain flight slots, gates, and ground facilities at key airports around the country. But the DOJ's concerns were well-founded: Defendants now control 80 percent of the airline industry; ticket prices continue to soar, despite plummeting fuel costs; flights are more crowded than ever; and airlines are reporting record profits. In other words, competition has been eliminated and consumers have paid a heavy price. This is not what Congress envisioned when it deregulated the airline industry in 1978.

17. In the years before the Class Period, the airlines suffered from several years of poor financial performance. According to the industry trade group Airlines for America, U.S. airlines' average net profit margin was nearly -4 percent from 2001-2010. This historically poor performance immediately before the Class Period incentivized Defendants to artificially inflate the prices for domestic air travel services. The recent wave of consolidation thus created the perfect environment for Defendants to implement, monitor, and enforce a price-fixing conspiracy. With only a handful of airlines controlling approximately 80 percent of the domestic market, the door has opened to coordinated and collusive behavior, and Defendants have walked right through it. The highly concentrated marketplace has allowed fewer and larger competitors to coordinate their strategy of "capacity discipline"—i.e., reducing the number of available flights and passengers carried on domestic flights—resulting in fewer flights and higher fares for consumers.

18. Defendants use "capacity discipline" as a pretext to fix, raise, maintain, and/or stabilize domestic airfare, attempting to put a legitimate veneer on their anticompetitive behavior. Indeed, consolidation coupled with "capacity discipline" has been a boon to the United States airline industry,

resulting in a combined $11.9 billion in profits in 2014 and $13.2 billion in profits in 2015, according

the International Air Transportation Association ("IATA") estimates. The increase in profits flows from

Defendants ability to fix the price of domestic airfare, which has climbed 13 percent from 2009 to 2014,

according to the federal Department of Transportation's Bureau of Transportation Statistics.

**B.      Defendants coordinate their capacity decisions to restrict supply and maintain prices.**

19.    Throughout the Class Period, Defendants have coordinated their "capacity discipline" through

public signaling of future capacity restrictions and publicly imploring each other to limit capacity

increases.

20.    In a competitive market, where each competitor acts independently and in its own self-interest,

it would not be in one airline's unilateral self-interest to inform their competitor of its capacity

discipline, for fear the competing airline would increase capacity to gain market share. Similarly, in the

face of rising demand, it would also not be in an airline's unilateral self-interest to exercise discipline at

all, for fear a competitor would not exercise the same discipline and instead increase capacity to gain

market share. But this is not a competitive market, as demonstrated by Defendants' explicit

coordination of capacity growth, and Defendants do not have to worry about losing market share to each

other.

21.    On June 11, 2015, *The New York Times* published an article titled "Discipline' for Airlines,

Pain for Fliers," reporting on a recent IATA meeting in Miami, Florida, which played host to a number

of the word's top airline executives, including Defendants', and the repeated use of the term

"discipline." The author described "discipline" as "classic oligopoly-speak for limiting flights and seats,

higher prices and fatter profit margins." That is, Defendants coordinate their capacity decisions, using

"capacity discipline" to avoid price competition and maintain profit margins at a level that would not

otherwise exist in a competitive marketplace.

22. For example, Delta's president, Ed Bastian, stated that Delta is "continuing with the discipline that the marketplace is expecting."

23. Similarly, Air Canada's chief executive, Calvin Rovinescu, stated that "people were undisciplined in the past, but they will be more disciplined this time."

24. American's chief executive, Dough Parker, stated that the airlines had learned their lessons from past price wars and that, "I think everybody in the industry understands that."

25. And United's CEO, Jeff Sismek, announcing that his company had nearly doubled profits in 2014, reassured investors that "[w]e will absolutely not lose our capacity discipline." These statements articulate Defendants' intent to coordinate their capacity decisions, sidestep competition, and extract supra-competitive profits from consumers.[1]

26. Throughout the Class Period, , Defendants have regularly signaled their plans to maintain "capacity discipline" to Wall Street.  In particular, Defendants utilized earnings calls and other investor calls to signal support for their unlawful agreement.

27. For example, on Delta's 2010 first quarter earnings call, Delta's Chief Executive Officer, Richard Anderson,  stated, "We will continue to be disciplined about capacity . . . We also believe capacity discipline is pretty important.  We're committed to keeping capacity in check . . . Our results in the March quarter demonstrate our disciplined approach to cost on a 4% reduction in capacity."

28. On Delta's 2010 second quarter earnings call, Anderson stated, "That leads us to overall capacity.  This quarter, our system capacity was down 0.6%.  For the full year 2010, we anticipate system capacity to be up 1% to 1.5%, and for the full year of 2011, we are budgeting capacity to be up about 1% to 3% for the system.  So we will maintain capacity discipline and keep our non-fuel CASM roughly flat."  Later in in response to a question for Gary Chase, an analyst at Barclays Capital, about

---

[1] Notably,  the IATA has frequently been a vehicle for collusion as demonstrated in the *In re Air Cargo Shipping Services Antitrust Litigation*, MDL No. 1775 (E.D.N.Y.), and *In re Transpacific Air Antitrust Litigation*, MDL No. 1913 (N.D. Cal.) antitrust class actions against the airlines.

the future capacity outlook, Delta President Ed Bastian responds, "So no, I don't think there's an change in our thinking about capacity in the least. And it's really the reason we gave the 2011 capacity, to show that we are expecting to maintain significant discipline and restraint in the low single digits, which is what we have indicated in the past." Anderson also reiterated, "I think the capacity discipline is continuing."

29.    On Delta's 2010 third quarter earnings call, analyst Jamie Baker of JP Morgan asks, "Richard, the term discipline is increasingly used when discussing the industry . . . As concisely as possible, can you provide your definition of discipline?" Anderson responds, ". . . So, basically, you keep up with demand, don't worry about chasing share, but instead focus on operating, what is going to increase the operating margin of the Company."

30.    On United's 2011 third quarter earnings call, Jim Compton, United's Chief Revenue Officer, in response to a question from Duane Pfennigwerth of Evercore Partners, Inc. about United's revenue growth outstripping GDP: "So again, I think our capacity discipline, as well as the industry discipline, what we've seen, I think, we've done a good job of not -- the traffic that we're missing is the low yield price-sensitive traffic and we're doing a good job of not diluting the higher-end traffic. And I think the capacity discipline has allowed us to do that. And I think that's probably the biggest difference in terms of breaking that GDP versus revenue growth that you mention." Compton later stated, "As with prior quarters this year, yield growth and capacity discipline drove United's third quarter revenue results."

31.    On November 15-16, 2011, Paul Jacobson, Delta's Senior Vice President and Treasurer, Gerry Laderman,  United's Senior Vice President of  Finance and Treasurer, and Derek Kerr, U.S. Airways' Chief Financial Officer  (later Executive Vice President and Chief Financial Officer) attended and were speakers at the Citigroup 2011 North American Credit Conference.  Kerr stated to his competitors and other conference attendees, "I think there are 3 main reasons why the industry is doing well.  The

consolidation that has happened over the last 4 years, capacity discipline and also, the a la carte revenues that have been put in place [i.e., bag and reservation fees] . . . Going forward, I mean the key is, and the question I get all the time, are people going to keep the capacity discipline that is in place today? . . . And every announcement I have seen from a capacity perspective is down or minimal growth in 2012, which is key for the industry that everybody is keeping the capacity disciple that we need to continue to make the industry profitable. . . So it's not the same industry that we've had in the past. There's been a lot of things going on since 2008. We've been forced as an industry to change. The consolidation has forced a lot of that. Capacity discipline, which we're going to maintain that capacity discipline that looks through 2012.

32.    On United's 2011 fourth quarter earnings call, Compton stated, "This is an excellent full year result for the domestic mainline entity. Fares throughout the year remain higher due to successful fare increases, industry wide capacity discipline and early network optimization from our merger."

33.    On U.S. Airways' 2011 fourth quarter earnings call, Derrick Kerr reported, "Mainline passenger revenues were $2.05 billion, up 11.3% driven by higher yields as a result of the strong pricing environment and industry capacity discipline."

34.    On U.S. Airways' 2012 first quarter earnings call, Kerr reported that "Mainline passenger revenues were $2.1 billion, up 11.4% as a result of the strong pricing environment and continued industry capacity discipline."

35.    On Delta's 2012 first quarter earnings call, Anderson stated, "You've heard us consistently state that we must be disciplined with capacity. To that end, our March quarter capacity was down by 3%, and for the full year, our system capacity will be down 2% to 3%. We continue to closely monitor all of our markets and for that matter, all of our city pairs to be certain we match supply to demand so that we may fully cover costs and meet our profit goals."

36.    On United's 2012 second quarter earnings call, Compton reaffirmed United's commitment to capacity discipline and also gave a 5-year capacity plan: "We remain committed to capacity discipline to generate sustained and sufficient profitability.  Our second quarter consolidated capacity decreased 0.6 year-over-year.  Although the cost of jet fuel came down, we recognize that jet fuel prices are very volatile, and we continue our commitment to capacity discipline. . . Importantly, we recognize the benefit capacity discipline brings, and we are not going to depart from the strategy.  Between our mainline and regional fleet, we have about 1,250 aircraft today.  Over our planning horizon of the next 5 years, we intend to keep our fleet count roughly flat."

37.    On U.S. Airways' 2012 fourth quarter earnings call, J. Scott. Kirby, President of U.S. Airways, in response to a question about international versus domestic profitability, stated, "I think to your point about is domestic getting better for industry, domestic, I think, has improved for the industry overall. We started from a higher base and so have improved it at a similar rate.  We still have a strongly profitable domestic system, but I think the whole industry has improved.  There's been more capacity discipline domestically than there has ever been internationally. . ."

38.    On U.S. Airways' 2013 first quarter earnings call, in response to an analyst question about fuel prices, Kirby took the opportunity to tell listeners that U.S. Airways was maintain capacity discipline regardless of fuel prices: "Well, I'm going to always prefer lower fuel prices to higher fuel prices.  I know sometimes the analysts write about the silver lining effects of high and volatile fuel prices leading to capacity discipline across the industry, in particular.  I think that capacity discipline would stay there, anyway."

39.    On March 3-5, 2013, all Defendants attended the JP Morgan Aviation, Transportation, and Defense Conference.  United's Chief Executive Officer, Jeff Smisek, directly communicated to his competitors and other conference attendees that, "This is also an industry that has learned the benefits of

capacity discipline. Capacity discipline has been very, very good for this business. I think we've all learned from it. Certainly, at United, we've learned from it and we intend to continue our capacity discipline. And as I'll talk about a little bit more today, we're going to continue that capacity and you will see that we have actually shrunk our airline and will shrink our airline, so for the past 3 years, we're actually smaller than we were before. The stability that consolidation has brought and capacity discipline has brought, that stability permits us to improve our balance sheet and you've seen others and you've seen us de-lever ourselves. . . And we're very, very focused on maintain our capacity discipline. We have learned that capacity discipline is profit maximizing and you're going to see us continue to do that. . . So we have a lot of flexibility buy its our current intent to keep our number flat over the next 5 years because capacity discipline works in this business."

40.    On Delta's 2014 first quarter earnings call, JP Morgan analyst Jamie Baker questioned Delta's Seattle expansion, stating that it had made "your owners a bit nervous, as it relates to capacity discipline." Delta's chief executive, Richard Anderson, responded, "And if you look at our capacity management over the past decade, it's been the most disciplined, and will continue to be the most disciplined." Anderson continued, "And as we said at our annual Investor Day last December, the growth that we are putting in the marketplace today is below GDP estimated growth."

41.    On Southwest's 2014 first quarter earnings call, Southwest stated that it, like its competitors, would "continue to have a disciplined growth strategy with flat year-over-year ASM capacity in 2014 and at least 2% to 3% seat growth in 2015."

42.    On Delta's 2014 second quarter earnings call, Anderson stated under "Long-Term Goals," that "As we look forward to the remainder of 2014 and beyond, Delta will continue to maintain the steady course we have been on, especially our disciplined approach to capacity levels. This discipline continues to be a key driver of our success as we will post record results for 2014."

12

43. On Southwest's 2014 third quarter earnings call, Chief Executive Officer Gary Kelly explained, "The economy—it's at least in our view—has been more consistent, more stable driving more confidence and more consistent travel demand. That's showing up. The industry is not adding a lot of capacity as well. So, the supply-demand obviously seems to be, from an industry perspective, in nice balance.

44. In announcing Delta's 2014 fourth quarter results, Anderson stated, "As we begin 2015, we have a significant opportunity from lower fuel pries, which will drive more than $2 billion in fuel savings over 2014. Through our capacity discipline, pricing our product to demand, and the fuel savings, we expect to drive double-digit earnings growth, along with increased free cash flow and a higher return on invested capital in the upcoming year."

45. More recently, during a March 2015 investment conference, American's president, Scott Kirby, remarked that all four Defendants were interested in expanding capacity only to the extent to which they could fit more people on the same number of airplanes. "All airlines for the most part are putting more seats on airplanes. We're doing it. United's doing it. Delta's doing it. Even Southwest is continuing to put more seats on their existing aircraft. Once you've done that, you're done."

46. In fact, Southwest has announced its plan to *reduce* its projected capacity increases in order to maintain profit margins. As Gary Kelly, Southwest's CEO, put it: "We don't want to grow 8 percent, we're not going to grow 8 percent and we can easily trim the schedule to stick to 7 percent."

47. Similarly, United's chief executive, Jeff Smisek, stated in 2015 that United is "going to run the airline for profit maximization and we're very focused on capacity discipline. . . We will absolutely not lose our capacity discipline."

48. These comments are then relayed to the other co-conspirators, thus facilitating their collusive, anticompetitive behavior. As explained by the Business Travelers Coalition, "Since recent U.S. airline

megamergers, we have witnessed near constant airline CEO calls for 'capacity discipline' during industry gatherings and analysts earnings calls only to be echoed by analysts in follow-on earning calls with other airlines. This represents perhaps the darkest hours of airline coordination. . ."

49.    Defendants have also been successful in policing and altering each other's behavior to ensure that their conspiracy to fix, raise, maintain, and/or stabilize domestic airfare will continue unabated. Take, for instance,  Southwest's comments regarding its plans for capacity growth—or lack thereof. Prior to the IATA conference in Miami, Southwest announced that it planned to increase capacity from 7 percent to 8percent  in 2015 by acquiring two new gates at its hub at Love Field, Dallas.  That is, until Southwest came under fire from the other Defendants, enduring a chorus calling for "discipline" by industry participants.  "Understandably, investors are questioning if this signals the end of the era of industry capacity discipline," according to Savanthi Syth,  a Raymond James analyst.  Similarly, Wolfe Research airline analyst, Hunter Keay, remarked that "[d]omestic capacity discipline has effectively vanished."

50.    Soon after the IATA meeting in Miami, Southwest capitulated, revised its projections downward to reassure investors and other airlines that it was still committed to "capacity discipline," and announced that is had "taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth, year-over-year, to approximately 7 percent."  The difference between 7 percent and 8 percent capacity growth for Southwest translates into the ability to carry—or in this case, not carry—more than 1.3 million additional passengers per year.

51.    Fiona Scott Morton, professor of economics at Yale and former deputy attorney general in the DOJ's antitrust division, explained that "[w]hen airline industry leaders say they're going to be 'disciplined,' they mean they don't want anyone to expand capacity.  And when there aren't enough seats, airlines raise prices.  That's what we have been seeing."

52.     Christopher L. Sagers, an antitrust professor at Cleveland Marshall College of Law echoed this market reality, stating "they're all but saying you need to limit output to keep up prices."

53.     And according to Reuters, an antitrust expert who asked not to be identified to protect business relationships stated, "The word 'discipline' is a no no. It's one of the words you don't use. It's like 101 in compliance."

54.     Ultimately, Defendants' efforts to coordinate and maintain "capacity discipline" have been successful. Throughout the Class Period, seating capacity on Defendants' domestic flights remained virtually unchanged, despite an increase in demand corresponding to the economic recovery. As a result of Defendants' anticompetitive conduct, the average inflation-adjusted domestic airfare rose from $354.02 in Q1 2010 to $392.66 by Q4 2014, according to data from the Department of Transportation's Bureau of Transportation Statistics.[2]

C.     **The United States' Department of Justice opens an investigation into collusive behavior in the airline industry.**

55.     On the heels of *The New York Times* article highlighting Defendants' statements at the IATA meeting in Miami, United States Senator for Connecticut, Richard Blumenthal, asked the DOJ to investigate collusion and anticompetitive behavior in the United States airline industry. Senator Blumenthal cited the DOJ's 2013 complaint seeking to block the American-U.S. Airways merger, stating that "[m]ost airlines have traditionally viewed capacity reductions as a highly valuable way to artificially raise fares and boost profit margins. In light of the unprecedented level of consolidation in the airline industry, this public display of strategic coordination is highly troubling."

56.     Senator Blumenthal further wrote: "DOJ's original complaint painted a stark picture of an extremely consolidated market, in which a few firms wield enormous market power to the detriment of consumers and competition – and in which high-level executives believe there is an unmistakable link

---

[2] http://www.rita.dot.gov/bts/airfares/national/chart

between fluctuations in capacity and fare hikes. . . During DOJ's original announcement rejecting the merger you stated 'High level executives at US Airways have talked about consolidation allows for capacity reductions that 'enable' fare increases.'"

57. Senator Blumenthal also acknowledged Southwest's decision to withdraw its planned increase in flight capacity, stating that "[t]he conclusion seems inescapable that the remarks made at IATA were targeted at Southwest and that its capitulation was the result of the 'fire' aimed at the company."

58. The DOJ responded by opening an investigation into Defendants' "capacity discipline." On July 1, 2015, the media widely reported that the DOJ had sent civil investigative demands ("CIDs") to a number of airlines on June 30, 2015. Emily Pierce, a spokesperson for the DOJ, confirmed the reports, stating that the Department was investigating "possible unlawful coordination" to limit capacity increases, thereby keeping ticket prices high. Each Defendant confirmed that it received a CID from the DOJ.

59. According to the Associated Press, the CIDs requested documents and information related to all communications the airlines had with each other, Wall Street analysts, and major shareholders about their plans for passenger-carrying capacity, or "the undesirability of your company or any other airline increasing capacity." The DOJ also asked each airline for its passenger-carrying capacity by region and overall since January 2011.

60. Senator Mike Lee, Chairman of Senate Judiciary Subcommittee on Antitrust, Competition Policy, and Consumer Rights, and Senator Amy Klobuchar issued statements welcoming the DOJ investigation. Specifically, Senator Lee stated:

> Americans deserve a strong and competitive passenger airline industry that offers safe service and reasonable fares. Reports of anticompetitive practices, especially in a time of rapid industry concentration, deserve a high level of scrutiny. The airlines already benefit from unique protections, including protection from competition with foreign air carriers in the domestic marketplace and antitrust immunity for international airline alliances, and so they have an even weightier responsibility to scrupulously abide by the law.

Senator Klobuchar added:

> Pricing in the airline industry has been a long-standing concern of everyone from families looking for an affordable vacation to small business owners trying to identify the best frequent flier program. The Justice Department must ensure that airlines are not entering into agreements that raise prices. Ensuring healthy competition is the core concern of the Antitrust Subcommittee, and we will be reviewing these allegations to determine how best to protect American consumers."

61. On July 1, 2015, George Jepsen, the Attorney General of the State of Connecticut, announced that his office will conduct a similar investigation into collusive activity among air carriers and that his office had sent letters to Defendants American, Delta, Southwest, and United.

62. The lack of competition in the airline industry is further illustrated by the recent, significant decrease in the cost of jet fuel, the single largest operating cost for an airline. In April of 2015, domestic airlines paid $1.94 per gallon of jet fuel, a decrease of 34% from the previous year. In a truly competitive marketplace, given low fuel prices, at least one airline would lower its rates to obtain market share and maintain revenues through increased volume. But this has not happened. Instead, American is "going to continue operating [] as though oil was still above $100 a barrel," according to American's CEO, Doug Parker, as he announced a record $4.2 billion in profits in 2014. That Defendants have been able to sell airfare above marginal cost—indeed, above increasingly falling marginal cost—evinces a marketplace sorely lacking competition.

63. Similarly, Mark Anderson, Delta's chief executive, reassured investors that "[w]e are not making any changes to our 2015 capacity in light of the lower fuel prices. . . In fact, we continue to trim capacity on the margin to maintain yields." But "[t]he idea that U.S. airlines would, once again, devolve into a war for market share is founded on a misunderstanding of the new structure of U.S. Airlines," Vinay Bhuskara, an industry analyst, wrote in Airways News. "We are unquestionably living with an airline oligopoly. . . Remember, this is the same management group that (instead of allowing passengers

to reap a modest reduction in fares) responded to the F.A.A's inability to collect taxes in mid-2011 by gleefully raising base fairs to where total out-of-pocket costs were exactly the same (earning a windfall of $28.5 million per day)."

64.     Defendants' ability to maintain supra-competitive prices in the face of falling fuel costs has not gone unnoticed by the United States Senate.  United States Senator Charles E. Schumer stated, in a December 2014 statement urging the federal government to conduct a price investigation on behalf of consumers, that "[a]t a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity. . . The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather."  .

**D.      The airline industry has a long history of anticompetitive behavior.**

65.     Defendants' current conduct is not the first instance of anticompetitive behavior related to airfare; rather, the industry's history is marred by such behavior.  As the DOJ's complaint challenging the American-U.S. Airways merger stated, "[t]he structure of the industry is already conducive to coordinated behavior." For instance, the Department noted the airlines' use of "cross market initiatives" ("CMIs") to deter price competition.  A CMI occurs when two or more airlines compete against each other on multiple routes.  When one airline undercuts the competition and offers more affordable airfare in one market, the affected competitors responds with a discount in another market, usually one where the former airline prefers a higher fare.  This retaliatory, anticompetitive behavior leads the discounting airline to reign in its competitive price, thus maintaining, stabilizing, and/or fixing the price of domestic airfare.

66.     The DOJ also described the creation of the Airline Tariff Publishing Company ("ATPCO"), a "dedicated price-telegraph network for the industry."  According to the DOJ, "[t]he airlines use ATPCO

to monitor and analyze each other's fares and fare changes and implement strategies to coordinate pricing. Airlines have previously used ATPCO to engage in coordinated behavior. In 1992, the United States filed a lawsuit to stop several airlines, including both defendants, from using their ATPCO filings as a signaling device to facilitate agreements on fares. That lawsuit resulted in a consent decree, now expired."

67.     Similarly, the DOJ referenced inappropriate communications between airlines related to domestic airfare. In 2010, one of U.S. Airways biggest rivals offered a "triple miles" promotion that set off a market share battle among air carriers. The rival airline was also rumored to be expanding its fleet and venturing into new markets. U.S. Airways' then-CEO complained about these aggressive maneuvers, stating to his senior executives that such actions were "hurting the [rival airline's] profitability – and unfortunately everyone else's." Senior management at U.S. Airways debated about the best way to get the rival airline's attention and bring it back in line with the rest of the industry. U.S. Airways' CEO urged the other executives to "portray [] these guys as idiots to Wall Street and anyone else who'll listen." To make sure the message was received, U.S. Airways' CEO forwarded the e-mail chain—and its candid discussion about how competition was bad for the industry—directly to the CEO of the rival airline. The rival's CEO immediately responded that the communication was inappropriate and that he was referring it to his general counsel.

68.     Defendants also coordinate the price of ancillary fees, including checked baggage fees and flight change fees. For instance, in May 2008, Defendant American announced that it would charge a fee for the first checked bag. Three weeks later, both United and U.S. Airways followed American's lead, announcing their intention to charge a similar fee. Likewise, over the course of two weeks in 2013, four airlines operated in lockstep to increase their ticket change fee for domestic travel from $150 to $200. Such fees have become a profitable source of revenue for Defendants, amounting to $6.5 billion

in 2014.  In particular, Defendant Delta's ancillary fee revenue increased 27 percent last year, resulting in an extra $50 million.

69.    Not least, Defendants have undertaken a campaign to reduce price transparency in the market for domestic air travel services, making it more difficult for consumers to purchase airfare at the best possible price.  Professor Fiona Scott Morton co-authored a report,  prepared for the Travel Technology Association, entitled "Benefits of Preserving Consumers' Ability to Compare Airline Fares."  The Report explains that approximately 44 percent of travelers shop for airfare through online travel agencies ("OTAs") (such as Orbitz, Priceline, and Expedia) or metasearch sites (such as Kayak, TripAdvisor, and Google Flights).  OTAs and metasearch sites offer price comparisons across many different airlines, permitting consumers to quickly and easily find the lowest prices offered for a desired route.  Furthermore, the Report states that, "at a time when independent, transparent comparison shopping is most needed, some airlines are attempting to restrict access to their fare and schedule information, reduce the ability of consumers to easily compare prices, and drive travelers to their own websites, which do not offer price comparisons with other airlines. . . [T]his combination of airline concentration with heightened attempts to lead travelers away from OTAs and metasearch travel sites is likely to lead to higher average airfares, increase consumers' search costs, make entry into city-pair routes by smaller airlines more difficult, reduce transparency, and strengthen the market power of the major airlines."

70.    For example, Delta has cut off a number of different OTA and metasearch sites from offering flight and price information related to Delta's flights.  In December 2010, Delta removed its flights from CheapOAir, BookIt.com, and OneTravel.  Then, in January 2011, Delta also cut off CheapAir.com, Vegas.com, AirGorilla, and Globester.  Delta has terminated its relationships with at least 21 OTAs.

71.    More recently, Delta has removed its flight information from a number of metasearch sites, including TripAdvisor, Fly.com, Hipmunk, and Routehappy.  In 2015, Delta also removed its flight information from Skyscanner.

72.    The Report concluded that restrictions on airline price information substantially reduces consumer welfare, with a potential cost that could exceed $6 billion per year and deterring 41 million potential passengers from flying annually.

## VI.    CLASS ALLEGATIONS

73.    Pursuant to Federal Rule of Civil Procedure 23(a) and (b), Plaintiff brings this action individually and on behalf of the following Class:

> All persons and entities who  purchased domestic air travel services for flights within the United States directly from Defendants, or any predecessors, subsidiaries, or affiliates thereof, between August 7, 2011, and the present.

74.    Excluded from the Class are governmental entities, Defendants, any parent, subsidiary, or affiliate of Defendants, and Defendants' officers, directors, employees, and immediate families.

75.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown at this time, Plaintiff believes that the Class includes thousands individuals geographically dispersed throughout the United States.

76.    The Class is defined in such a way so that the identity of the Class members is objectively ascertainable, and the identity of the Class members can be confirmed via Defendants' records.

77.    Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of other Class members because Plaintiff purchased domestic air travel services directly from one or more Defendants or their co-conspirators.  As a result,  Plaintiff and the Class sustained damages arising out of Defendants' common course of anticompetitive conduct in violation of the Sherman Act, Section 1.  .

78.    Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff is a direct purchasers of one or more domestic flight(s) and has no conflict with any other members of the Class Plaintiff has retained counsel that is competent, experienced, and able to prosecute this class action.

79.    Common questions of law and fact exist as to all members of the Class.  The common questions of law and fact predominate over any questions affecting only individual class members. Common questions of law and fact, include:

   a.    Whether Defendants combined or conspired to fix, raise, maintain, and//or stabilize the price of domestic airfare;

   b.    Whether Defendants combined or conspired to restrict the capacity of domestic flight seats sold in the United States;

   c.    Whether Defendants shared non-public information, allocated markets and customers, restricted the supply of seats sold on domestic flights in the United States, and committed other anticompetitive conduct in furtherance of the alleged conspiracy;

   d.    Whether the purpose and/or effect of the acts and omissions alleged herein was to fix, control, and/or maintain the price of domestic airfare ;

   e.    Whether Defendants' agents  in correspondence and meetings in furtherance of an illegal price-fixing conspiracy, and, if so, whether such agents were acting within the scope of their authority and in furtherance of Defendants' business interests;

   f.    The existence and duration of the conspiracy to fix, raise, maintain, and/or stabilize the price of airfare for domestic air travel;

   g.    Whether, and to what extent, Defendants' conduct caused injury to Plaintiff and the Class, and, if so, the appropriate measure of damages;  and

   h.    Whether Plaintiff and the Class are entitled to injunctive relief to prevent the continuation and furtherance  of the illegal price-fixing conspiracy.

80.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of individual actions would impose a heavy burden upon courts and Defendants, creating the risk of inconsistent or varying adjudications on the questions of law and fact common to the Class.  A class action would achieve substantial economies of time, effort, and expense,

and assure uniform decisions as to all persons similarly situated without sacrificing procedural fairness or bring about undesirable results.

## VII.   CLAIM FOR RELIEF

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### (15 U.S.C. § 1)

81.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

82.   Defendants have entered into and engaged in a contract, combination, or conspiracy to artificially fix, raise, maintain, and/or stabilize the price of  domestic air travel services within the United States.  Defendants' conduct has resulted in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

83.   Defendants agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing the price of domestic air travel services within the United States at an artificial, supra-competitive level.

84.   Defendants engaged in anticompetitive activities, with the purpose and effect of artificially fixing, raising, maintaining, and/or stabilizing the price of domestic air travel services within the United States.

85.   The contract, combination, or conspiracy has resulted in an agreement, understanding, or concerted action between and among Defendants to fix, raise, stabilize, and/or maintain the price of domestic air travel services within the United Sates.  The contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

86.   The illegal combination or conspiracy alleged herein had the following anticompetitive effects:

    a.   The prices charged by Defendants to, and paid by Plaintiff and the Class, for domestic airfare travel services within the United States were fixed, raised, maintained, and/or stabilized at artificial, supra-competitive levels;

b.   Plaintiff and the Class have been deprived of free and open competition in the purchase of air travel services within the United States;

c.   Plaintiff and the Class have been required to pay more for domestic air travel services within the United States than they would have paid in a competitive marketplace, absent Defendants' anticompetitive conduct; and

d.   Competition in the sale of domestic air travel services within the United States has been restrained.

87.   As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have been injured and damages in their business and property in an amount to be proved at trial.

88.   Plaintiff and the Class are each entitled to treble damages for Defendants' violation of federal antitrust laws.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment on behalf of Plaintiff and the Class, adjudging and decreeing that:

A.   This action be maintained as a class action under Rule 23(b)(3) of the federal Rules of Civil Procedure, designating Plaintiff as Class representative and appointing Plaintiff's counsel as Class Counsel;

B.   Defendants' conduct alleged herein to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Action, and that Plaintiff and the Class have been injured in their business and property as a result of Defendants' violation;

C.   Defendants, their subsidiaries, affiliates, successors, transferees, and assignees and their respective officers, directors, partners,  agents, and employees, as well as all other persons acting

or claiming to act on their behalf, be permanently enjoined and restrained from continuing and

maintaining the conspiracy alleged herein;

D.      Plaintiff and the Class may recover damages, as provided under federal antitrust laws,

and that a joint and several judgment in favor of Plaintiff and the Class be entered against

Defendants in an amount to be trebled in accordance with the law;

E.      Plaintiff and the Class may recover their costs of suit, including reasonable attorneys'

fees, as provided by law; and

F.      Plaintiff and the Class receive such further relief as the Court may deem just and proper.


Dated: August 24, 2015                          Respectfully submitted,


                                                /s/ Edward A. Wallace
                                                Edward A. Wallace
                                                Amy E. Keller
                                                Tyler J. Story
                                                **WEXLER WALLACE LLP**
                                                55 West Monroe Street
                                                Suite 3300
                                                Chicago, Illinois 60603
                                                Tel. (312) 346-2222
                                                Fax (312) 346-0022
                                                eaw@wexlerwallace.com
                                                mrm@wexlerwallace.com
                                                aek@wexlerwallace.com

                                                Gregory F. Coleman
                                                Lisa A. White (pro hac vice forthcoming)
                                                **GREG COLEMAN LAW PC**
                                                800 S. Gay Street, Suite 1100
                                                Knoxville, TN  37929
                                                T:  (865) 247-0080
                                                F:  (865) 522-0049
                                                greg@gregcolemanlaw.com
                                                lisa@gregcolemanlaw.com

                                                *Attorneys for Plaintiff and the Putative Class*